UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------x

SHIH WEI SU,                                                  :

                              Plaintiff,          :   COMPLAINT

            -against-                          :   Index No.

THE CITY OF NEW YORK,

                             Defendant.

--------------------------------------------------------------------------x

      Plaintiff, SHIH WEI SU, by his attorney, JOEL B. RUDIN, complaining of the

defendant, respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

      1.     This is a civil action, pursuant to 42 U.S.C. §§ 1983, 1985 and 1988, seeking

$25,000,000 in damages, for the conduct of the Queens District Attorney's Office in

knowingly presenting perjured testimony and deceiving a jury into wrongfully convicting

plaintiff of attempted murder.  The prosecutor's indefensible actions, resulting from a

culture of misconduct at her Office, caused plaintiff, a young man just 19 years of age, to

spend the next 12 years of his life in State prison.

      2.     The wrongful conduct here was much more than that of a single young

prosecutor.  It was perpetuated and ratified by high-level officials in the Queens District

Attorney's Office, all acting in the name of the District Attorney, Richard Brown.  They

tried to cover up the misconduct and then, failing that, used technical procedural

arguments to block plaintiff's efforts to obtain a new trial.  Finally, the United States Court

of Appeals said, in effect, "enough."

3.     On July 11, 2003, the Court of Appeals vacated plaintiff's conviction and 50-year sentence. It concluded that the trial prosecutor had "knowingly elicited false testimony from a crucial witness," in violation of plaintiff's federal due process rights, thereby leading to his conviction. The D.A.'s Office then blocked his release on bail for four months, but ultimately had to admit it lacked evidence with which to retry him. After 12 long years, plaintiff's indictment was dismissed, and he was freed.

4.     Plaintiff's wrongful conviction was not unique in Queens -- far from it. There has been a startling history of appellate reversals for misconduct by Queens prosecutors in defrauding or misleading judges, juries and defendants by concealing evidence favoring the defense or by using false, misleading or inflammatory "evidence" and argument to bring about unlawful convictions: 84 such cases are summarized in an addendum to this complaint.

5.     Because the Queens District Attorney is the policymaker for defendant City of New York with respect to the administration of that Office, and the D.A.'s unlawful policies and practices in tolerating such misconduct were a substantial cause of plaintiff's wrongful criminal conviction and 12 years' imprisonment, the City is liable to plaintiff pursuant to Monell v. City of New York, 436 U.S. 658 (1978), and 42 U.S.C. § 1983.

## JURISDICTION and VENUE

6.     This action arises under 42 U.S.C. §§ 1983, 1985 and 1988. Jurisdiction is

2

conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

8.    This action has been timely commenced within three years of the accrual of plaintiff's causes of action.

## THE PARTIES

9.    Plaintiff SHIH WEI SU is a resident of the State of New York, residing within the Eastern District of New York.

10.    Defendant CITY OF NEW YORK is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

11.    The District Attorney's Office of Queens County is an agency of the City of New York.

12.    The District Attorney ["D.A."] and Assistants District Attorney of Queens County ["ADAs" or "prosecutors"] are agents and employees of the City of New York.

13.    At all times material to this complaint, the ADAs involved in violating plaintiff's constitutional rights, and all individuals who acted in concert with them to do so, acted toward plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of their employment.

3

## THE RELEVANT FACTS

### The Trial

14.     On January 4, 1991, at about 3 p.m., two young men, Richard Tan and Lawton Ki, were shot and seriously wounded at the Royal Billiard Hall at 42-02 215th Street in Queens.

15.     A friend of theirs, Jeffrey Tom, claimed to have been present during the shooting.

16.     In initial statements to police, none of the above three individuals implicated plaintiff in the shooting.

17.     However, Tom then changed his story and accused plaintiff of having directed another man named "Jimmy" to shoot Tan and Ki.

18.     Plaintiff subsequently was arrested and indicted for their attempted murder.

19.     The case was assigned for trial to Assistant District Attorney Linda Rosero.

20.     Ms. Rosero, who knew the case was thought to be weak and a probable loser, told her supervisor that she lacked the capability to handle it.

21.     However, the supervisor challenged her to take the case anyway, telling her that if she was afraid, he would try it himself.

22.     Several months before the start of plaintiff's trial, Tom pleaded guilty in the Supreme Court, Queens County, to extorting money from a restaurant owner by instilling fear.

4

23.     The prosecutor in Tom's case was a colleague of Ms. Rosero's in the Queens D.A.'s Office.

24.     At the time of Tom's guilty plea, Tom's prosecutor, Tom and Tom's attorney all confirmed, on the record, that they had made a deal for Tom to testify against plaintiff in exchange for leniency in Tom's extortion case.

25.     The terms of the deal were that, in exchange for his testimony against plaintiff, Tom would receive probation and a Youthful Offender Adjudication, meaning that he would have no criminal record. The judge in Tom's case agreed he would honor this deal.

26.     Thereafter, at Tom's sentencing, Tom's prosecutor asked the judge to "honor the negotiated plea" because Tom had fulfilled his side of the bargain, and the judge did so, treating Tom as a "Youthful Offender" and sentencing him to probation.

27.     Tom's plea and sentencing proceedings were sealed, meaning no one other than the court, Tom and his attorney, and prosecutors at the Queens D.A.'s Office had access to the transcript or knew what had occurred.

28.     Shortly before plaintiff's trial began, ADA Rosero misled plaintiff and his attorney by representing that her Office had no made no deal with Tom. She stated that it was the *judge* in Tom's case who "basically told [Tom] that if he pled to the indictment, ... he would get probation." She added that there "might have been some talk about [Youthful Offender] treatment," but "technically there was no agreement" as far as she

5

knew.

29.     At trial, Tom was the key witness against plaintiff.

30.     Tom testified that he, Tan and Ki were members of the Green Dragons, a

youth gang involved in extortion and other violence.

31.     Tom claimed that plaintiff was a member of a rival gang.

32.     Tom further claimed that plaintiff, while wearing a sling, gave an order

for "Jimmy" to shoot Tan, that plaintiff walked out of the pool hall, and that "Jimmy" then

shot Tan and Ki.

33.     Thereafter, under direct examination by ADA Rosero, Tom blatantly lied

by falsely denying that the D.A.'s Office or his sentencing judge had made "any promise"

to him regarding his sentence.

34.     Asked again by ADA Rosero about "what if anything" Ms. Rosero, other

prosecutors, or the "Office" had promised him, Tom replied: "Nothing at all."

35.     Under cross-examination, Tom testified falsely, contrary to his

sealed guilty plea, that he had not pressured the store owner for money.

36.     Although plaintiff's attorney then complained to the court that Tom must

have been lying in denying coercive conduct, ADA Rosero, who alone had access to

Tom's sealed plea proceedings, did not correct Tom's false testimony minimizing his

criminal conduct.

37.     Nor did Ms. Rosero correct Tom's false testimony, which she had elicited,

in which Tom denied any deal to testify against plaintiff.

38.   The additional evidence against plaintiff was weak.

39.   Tan, Tom's fellow Green Dragons gang member, testified that a man with a sling said "shoot them," but did not identify plaintiff as that man.

40.   The other victim, Ki, also a member of the Green Dragons gang, claimed that he heard plaintiff say "shoot" just before Ki was shot.

41.   Meanwhile, Ki admitted:

   (a)   He did not know plaintiff;

   (b)   He was not really paying attention before the shooting;

   (c)   He could not see what was happening after he was shot; and

   (d)   He had made no mention in his grand jury testimony of having heard anyone say "shoot."

42.   Ki also contradicted Tom's testimony by claiming he did *not* see anyone in a sling and that plaintiff was still present when the shooting occurred.

43.   Contrary to Tom's testimony, both Ki and Tan lied by denying they were members of the Green Dragons.

44.   Although more than 30 people were present in the pool hall when the shooting occurred, the prosecution produced no other eyewitnesses.

45.   The prosecution also produced no physical evidence linking plaintiff to the shooting.

7

46.     Meanwhile, called as a defense witness, the bartender testified that plaintiff, whom he knew, was not in the pool hall prior to the shooting.

47.     During closing arguments to the jury, when defense counsel contended that Tom's testimony denying having committed extortion was implausible, the prosecutor compounded her misconduct by objecting even though she knew defense counsel's argument was correct.

48.     In addition, knowing that Tom had lied, the prosecutor improperly vouched for his credibility by falsely representing that Tom was "honest with you"; he was "truthful, and honest."

49.     As a result of the prosecutor's misconduct, the jury convicted plaintiff of two counts of attempted murder, two counts of assault, and criminal possession of a weapon. On February 25, 1992, the court followed ADA Rosero's recommendation and sentenced plaintiff to the maximum total sentence of 16 2/3 to 50 years in prison.

## Post-Trial Proceedings

50.     In his appeal, plaintiff contended his conviction should be reversed because Tom's testimony was false and the prosecutor had failed her obligation to correct it.

51.     Instead of revealing the truth, the D.A.'s Office defended both Tom's testimony and the prosecutor's failure to correct it. The prosecution's brief stated: "The record available on appeal suggests that the People and prosecution witness Tom fully disclosed the disposition of Tom's pending criminal case."

52.     The D.A.'s appellate brief argued that the court should not even consider plaintiff's contention concerning Tom's testimony because plaintiff had not made part of the record on appeal the transcript of Tom's sentencing.

53.     This transcript had been sealed at an ADA's request precisely so that it would not be available to plaintiff.

54.     Plaintiff's appeal was denied.  See People v. Su, 213 A.D.2d 502 (2d Dept.), lv. to app. den., 85 N.Y.2d 980 (1995).

55.     On December 3, 1998, a Legal Aid Society attorney appointed to represent plaintiff, Katheryne M. Martone, filed a motion on plaintiff's behalf to unseal Tom's plea and sentencing minutes.

56.     She contended that the minutes probably would reveal that Tom had perjured himself at trial.

57.     Incredibly, the D.A.'s Office, which previously had blamed plaintiff for failing to make these sealed minutes part of his initial appeal, opposed this motion.

58.     However, the court ruled in plaintiff's favor, reasoning that the D.A.'s Office "has no legitimate interest in shielding possible perjury."

59.     Even after the minutes were unsealed and revealed that Tom had perjured himself at plaintiff's trial, prosecutors used procedural technicalities to successfully oppose another State court motion by plaintiff, filed in 1999, to overturn his conviction.

60.     On June 1, 2001, plaintiff filed a habeas corpus petition in the United States

9

District Court for the Eastern District of New York seeking to vacate his conviction and to be freed.

61.     In his petition, plaintiff contended that prosecutors had violated his federal constitutional rights by failing to disclose evidence undercutting Tom's credibility as a witness, by presenting Tom's false testimony and failing to correct it, and by presenting false or misleading argument to the jury that Tom's false testimony was truthful.

62.     Still denying that prosecutors had done anything wrong, the D.A.'s Office opposed plaintiff's application, both in the District Court and on appeal to the U.S. Court of Appeals.

### The Federal Court of Appeals' Decision

63.     In an unanimous decision dated July 11, 2003, the United States Court of Appeals ordered that the writ of habeas corpus be granted and that plaintiff be released from custody unless he was re-tried within 60 days.   Su v. Filion, 335 F.3d 119 (2d Cir. 2003) (A copy of this decision is annexed as Exhibit A to this complaint.)

64.     The Court found that Tom's denial that he was promised anything by the sentencing judge or by the prosecution in exchange for his testimony was "obviously false" and also that he had lied about the nature of his criminal conduct.

65.     The Court condemned the prosecutor's failure to correct these misrepresentations and her summation "bolster[ing] Tom's credibility." Id. at 127.

66.     The Court found that the prosecution had "knowingly elicited false

10

testimony." Id. at 121.

67.     It suggested that, had the jury learned that the prosecution's key witness

had lied and the "prosecutor knowingly (or recklessly) elicited the false testimony," the

effect on the People's case would have been "devastating." Id. at 129 n.6.

68.     Finally, pointing out that the evidence against plaintiff was "not

overwhelming" and that Tom's credibility was "central to the deliberations of any

reasonable jury," id. at 129, the Court concluded that plaintiff had been prejudiced by the

prosecutor's misconduct and therefore that plaintiff's conviction had to be overturned.

69.     On November 5, 2003, the Queens D.A.'s Office, admitting that it had

insufficient evidence with which to retry plaintiff,  moved to dismiss the prosecution, the

indictment was dismissed, and plaintiff, after 12 years in prison, was released.

### Plaintiff's Injuries and Damages

70.     As a direct and proximate consequence of the aforementioned actions by the

defendants, plaintiff:

(a)     Suffered nearly 12 years of imprisonment;

(b)     Suffered physical injuries and physical sickness;

(c)     Was subjected to degrading, dehumanizing and emotionally destructive
        conditions;

(d)     Suffered and continues to suffer mental and emotional distress and harm;

(e)     Was denied the opportunity to pursue normal relationships with his family

11

and his friends;

(f)     Was publicly shamed, disgraced, ridiculed and humiliated and suffered

damage to reputation;

(g)     Had to pay and incurred debts for the costs of his legal defense;

(h)     Lost substantial employment income and permanent impairment of earning

power; and

(i)     Incurred other items of attendant damages.

## AS AND FOR A FIRST CAUSE OF ACTION

[42 U.S.C. § 1983; Due Process]

71.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1-70

of this Complaint, and hereby incorporates them as though fully set forth herein.

72.     Acting individually and collectively on behalf of the Queens District

Attorney, ADAs withheld favorable, material evidence from plaintiff and his attorneys,

presented false and misleading testimony and argument against plaintiff at his trial, failed

to correct such testimony and argument, acted to conceal the aforementioned wrongdoing

from plaintiff and his attorneys, and perpetuated and ratified such misconduct in their 11-

year opposition to plaintiff's motions and appeals seeking to overturn his wrongful

conviction.

73.     The aforesaid conduct operated to deprive plaintiff of his rights under the

Constitution and the laws of the United States:

12

(a)   To timely disclosure for use at trial, sentencing, appeal, or collateral attack of all material evidence favorable to his defense, including impeachment evidence as well as evidence necessary to correct false or misleading testimony or argument presented by the prosecution, pursuant to Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150, (1972), and their progeny, and the Due Process Clauses of the Fifth and Fourteenth Amendments;

(b)   Not to be convicted based upon false or misleading testimony or argument knowingly or recklessly presented by prosecutors, pursuant to Mooney v. Holohan, 294 U.S. 103, 112 (1935), and the Due Process Clauses of the Fifth and Fourteenth Amendments; and

( c)   The right to a fair trial pursuant to the Fifth, Sixth and Fourteenth Amendments.

74.   The foregoing violations of plaintiff's rights amounted to Federal Constitutional torts and were affected by actions taken under color of State law, and within the scope of the employment and authority of the ADAs involved.

75.   The foregoing violations of plaintiff's federal constitutional rights were directly, proximately and substantially caused by conduct, chargeable to defendant City of New York, namely,

(a)   the institution and implementation of unlawful policies, procedures, regulations, practices and/or customs concerning

i.   the continuing obligation to make timely disclosure to the defense, before, during and after trial, of material evidence favorable to the defense;

ii.   the duty not to present at trial false, misleading, improper or unreliable evidence, testimony, statements or argument; and

iii.   the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements or

13

argument, whenever such acts occurred, and to remedy the
harm caused by such acts; and/or

b.    Deliberate indifference by policymaking officials at the Queens
D.A.'s Office to their obligation to properly instruct, train, supervise
and discipline their employees, including the ADAs involved in the
prosecution of plaintiff's case, with respect to such matters.

76.    The aforesaid unlawful policies, procedures, regulations, practices and/or
customs (including the failure to properly instruct, train, supervise and/or discipline
employees with regard thereto) were implemented or tolerated by policymaking officials
for the defendant City of New York, including, but not limited to, the District Attorney of
Queens County, who knew

a.    to a moral certainty that such policies, procedures, regulations,
practices and/or customs concern issues that regularly arise in the
prosecution of criminal cases,

b.    that such issues either present employees with difficult choices of the
sort that instruction, training and/or supervision will make less
difficult or that the need for further instruction, training, supervision
and/or discipline was demonstrated by a history of employees
mishandling such situations, and

c.    that the wrong choice by municipal employees concerning such issues
will frequently cause the deprivation of the constitutional rights of a
criminal accused and cause him constitutional injury.

77.    Despite their knowledge of said policies, procedures, regulations, practices
and/or customs, the supervisory and policymaking officials of the defendant City, as a
matter of policy, perpetuated, or failed to take preventative or remedial measures to
terminate, said policies, procedures, regulations, practices and/or customs, did not

14

discipline or otherwise properly supervise the individual personnel who engaged in them, and did not adequately instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority.

78.    Instead, the aforementioned policy-making officials sanctioned the policies, procedures, regulations, practices and/or customs, described above, with a deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the State of New York.

79.    The unlawful policies, procedures, regulations, practices and/or customs of the defendant City in withholding evidence favoring criminal defendants, in presenting false, misleading or improper evidence, testimony or argument at criminal trials, and in condoning, sanctioning, covering up and ratifying such misconduct, is exemplified by an extraordinary history of appellate decisions reversing criminal convictions obtained by the Queens District Attorney's Office under former District Attorney John Santucci and present District Attorney Richard Brown, including, but not limited to, the instances set forth in Exhibit B to this Complaint, which plaintiff incorporates by reference.

80.    Upon information and belief, few if any of the prosecutors responsible for the misconduct found in the aforementioned cases were investigated or disciplined by the Queens District Attorney, or referred to outside disciplinary bodies for such action.

81.    Instead, as in plaintiff's case, supervisors in the Office denied, defended and ratified the misconduct in virtually all such cases.

15

82.    The aforesaid unlawful policies, procedures, regulations, practices and/or customs of defendant City were individually and collectively a substantial factor in bringing about the violations of plaintiff's rights under the Constitution and laws of the United States and in causing his conviction, imprisonment and related damages.

83.    Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters.

84.    The District Attorney of Queens County, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to such conduct.

85.    During all times material to this Complaint, the Queens County District Attorney owed a duty to the public at large and to plaintiff, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs and practices adequate to deter and to avoid conduct by his subordinates violating the aforementioned constitutional rights of criminal defendants and of other members of the public.

86.    By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of plaintiff's constitutional rights and his constitutional injuries.

16

## JURY TRIAL DEMAND

87.     Plaintiff demands trial by jury of all issues in this action.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

I.      For compensatory damages in the amount of $25,000,000;

II.     For reasonable attorneys' fees, together with costs and disbursements,

pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

III.    For pre-judgment interest as allowed by law;

IV.     For such other and further relief as to this Court may seem just and

proper.

JOEL B. RUDIN, ESQ. (JR 5645)
200 West 57th Street
Suite 900
New York, New York  10019
(212) 752-7600 (tel.)
(212) 980-2968 (fax)
Email: jbrudin@aol.com

*Attorney for Plaintiff*

Dated:     New York, New York
           February 14, 2006

17

335 F.3d 119
**(Cite as: 335 F.3d 119)**

Page 1

**H**

United States Court of Appeals,
Second Circuit.

SHIH WEI SU, Petitioner-Appellant,
v.
Gary H. FILION, Superintendent, Coxsackie
Correctional Facility, Respondent-
Appellee.

Docket No. 02-2683.

Argued: April 21, 2003.
Decided: July 11, 2003.

After petitioner's state court convictions for attempted murder, assault, and criminal possession of a weapon were affirmed on direct appeal, 213 A.D.2d 502, 624 N.Y.S.2d 904, petitioner sought federal writ of habeas corpus. The District Court, Ross, J., denied petition. Petitioner appealed. The Court of Appeals, Calabresi, Circuit Judge, held that: (1) prosecution witness gave false testimony as to existence of plea bargain and the nature of his grand larceny conviction; (2) testimony was known or should have been known by prosecutor to be false; (3) it would be an unreasonable application of federal law to require petitioner to cross-examine lying witness regarding his denial of existence of plea bargain; and (4) convictions were required to be set aside, as they depended significantly on false testimony elicited by prosecutor.

Reversed and remanded.

West Headnotes

**[1] Habeas Corpus ☞431**
197k431 Most Cited Cases

State waived argument that habeas petitioner's claims were procedurally barred, thereby obviating the need for the Court of Appeals to examine whether there was federally valid cause and prejudice, for such a default, where state asserted only that the decisions made by the state courts constituted an adjudication on the merits of petitioner's claims, requiring a habeas court to give those decisions deference under the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C.A. § 2254(d).

**[2] Criminal Law ☞700(1)**
110k700(1) Most Cited Cases

The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost.

**[3] Criminal Law ☞990.1**
110k990.1 Most Cited Cases

"Structural errors" are those that so fundamentally undermine the fairness or the validity of the trial that they require voiding the result of the trial regardless of identifiable prejudice. U.S.C.A. Const.Amend. 6.

**[4] Criminal Law ☞1171.8(1)**
110k1171.8(1) Most Cited Cases

Even when a prosecutor elicits testimony he or she knows or should know to be false, or allows such testimony to go uncorrected, a showing of prejudice is required to warrant reversal of the conviction.

**[5] Criminal Law ☞1171.8(1)**
110k1171.8(1) Most Cited Cases

A criminal conviction must be set aside when a prosecutor elicits testimony he or she knows or should know to be false or allows such testimony to go uncorrected, unless there is no reasonable likelihood that the false testimony could have affected the judgment of the jury.

**[6] Criminal Law ☞706(2)**
110k706(2) Most Cited Cases

Prosecution witness gave false testimony as to the existence of his plea bargain and the nature of his grand larceny conviction, in prosecution for attempted murder and assault, by testifying that he was not promised anything by prosecution in exchange for his testimony against defendant and that his conviction stemmed from him asking someone politely for money, where witness's sentencing hearing transcript indicated that he was promised five years probation and youthful offender treatment in exchange for his testimony against defendant, and witness admitted at his plea hearing that he attempted to steal money from his victim by means of extortion.

**[7] Criminal Law ☞706(2)**

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

335 F.3d 119
**(Cite as: 335 F.3d 119)**

Page 2

110k706(2) Most Cited Cases

Prosecution witness's false testimony denying the existence of his plea bargain and the nature of his grand larceny conviction was known or should have been known by prosecutor to be false, so that prosecutor elicited false testimony, in prosecution for attempted murder and assault; even if different prosecutor negotiated plea bargain with witness, prosecutor in defendant's case had fundamental obligation to determine whether any promise was made to witness in exchange for testimony and disclose it, prosecutor failed to correct false testimony, and prosecutor objected when defense counsel expressed incredulity that witness's conviction occurred as a result of him politely asking victim for money.

**[8] Habeas Corpus ☜491**
197k491 Most Cited Cases

It would be an unreasonable application of federal law, as determined by the Supreme Court, requiring a habeas petitioner to show that he exercised due diligence in gathering and using information to rebut a lying prosecution witness, to determine that petitioner failed to exercise such due diligence in not proceeding to cross-examine prosecution witness regarding witness's denial of existence of plea bargain, and thus, habeas relief would be warranted, where prosecutor affirmatively stated that there was no plea deal with witness and elicited testimony from the witness denying the existence of any deal. 28 U.S.C.A. § 2254(d)(2).

**[9] Habeas Corpus ☜491**
197k491 Most Cited Cases

Defendant's convictions for attempted murder and assault were required to be set aside, on habeas review, as convictions depended significantly on false testimony of prosecution witness elicited by prosecutor, that witness did not receive plea deal from prosecution in exchange for his testimony, and that his grand larceny conviction was based upon him politely asking someone for money; other evidence against defendant was not overwhelming, and existence of witness's plea bargain was material to assessing witness's credibility, which was central to case.
\*121 Katheryne M. Martone, Legal Aid Society, Brooklyn, New York, for Appellant.

Donna Aldea, Assistant District Attorney, for Richard A. Brown, District Attorney for Queens County (John M. Castellano, Lisa Drury, Assistant District Attorneys, on the brief), Kew Gardens, New York, for Appellee.

Before: CALABRESI, F.I. PARKER, SACK, Circuit Judges.

CALABRESI, Circuit Judge.

Petitioner-Appellant Shih Wei Su has brought a habeas corpus petition under 28 U.S.C. § 2254 challenging his conviction in New York state court on two counts of attempted murder in the second degree, two counts of assault in the first degree, and one count of criminal possession of a weapon in the second degree. He claims that the prosecution misled the trial court concerning the cooperation agreement it had with a key witness, Jeffrey Tom, and that the prosecution knowingly allowed Tom to perjure himself.

The district court (Ross, *J.*) first found that the state courts that had reviewed Petitioner's conviction had adjudicated his prosecutorial misconduct claim on the merits. The court then held that the prosecution had breached both (a) its duty to disclose exculpatory evidence, *see, e.g., Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and (b) its duty not to elicit testimony it knows to be false, *see, e.g., Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The district court did not, however, grant the writ of habeas corpus. It concluded that Petitioner had not shown sufficient prejudice to justify overturning his conviction. Nevertheless "on the question of whether petitioner has demonstrated that the prosecutorial misconduct so prejudiced his conviction as to undermine confidence in the jury's verdict," the court granted a certificate of appealability. Joint Appendix at 6.

We agree with the district court that the prosecution knowingly elicited false testimony from a crucial witness with regard to a cooperation agreement that existed between that witness and the prosecution. But we believe the district court erred in its analysis of the prejudice stemming from the prosecutor's misconduct. Because we reverse the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

335 F.3d 119
(Cite as: 335 F.3d 119)

order of the district court on this ground, we do not reach any of Petitioner's additional allegations of prosecutorial misconduct, neither those linked to other putative lies by the same witness nor those that stemmed from the asserted *Brady* violations.

### *122 The shooting

The criminal charges against Petitioner arose out of a shooting that occurred at a pool hall in Queens on January 4, 1991. Tom--the witness whose testimony is the subject of the habeas petition--testified that he entered the pool hall on that date and, together with two individuals he said were fellow members of a street gang known as the Green Dragons, [FN1] sat down near the entrance. Tom further testified that there were "close to maybe 30" other people there at the time. He added that, shortly thereafter, three men and one woman came from the back of the establishment toward the entrance to pay for a pool table. The table was near where Tom and his companions were sitting. Tom testified that he knew two of the four by name: Petitioner, who was allegedly wearing a sling on his right arm, and a man Tom called Jimmy. Tom stated that the four were members of a rival gang--known as the White Tigers--which frequented the pool hall.

> FN1. Both of these individuals denied at trial that they were members of the Green Dragons.

Tom added that the Dragons and the Tigers had not previously engaged in violence against each other. They had been hostile but the manifestation of this rivalry had been "[j]ust basically words said back and forth." Consistent with this, when Petitioner and his companions approached the counter to pay for a pool table, there were "stares going back and forth" between the gangs. The staring lasted about a minute.

According to Tom, however, after the White Tigers had paid for their table, he heard Petitioner say to Jimmy, "[W]hen I leave shoot them." Tom reiterated a slight variation--"Shoot them when I leave."--on cross-examination and added that he remembered the statement distinctly because Petitioner had said it loudly.

Tom continued that Petitioner, having made the statement, walked out of the pool hall. At that point, the man Tom knew as Jimmy allegedly removed his jacket, revealing a gun. Tom then ducked, heard shots fired, and, a minute later, got up to find one of his companions with a gunshot wound. Tom says he quickly ran outside and saw Petitioner and the other White Tigers "half way down the block already running." Tom did not explain what he and his companions did upon hearing Petitioner's "loud" order to shoot them or while Petitioner was walking out of the pool hall.

The rest of the testimony at trial, though on the whole supporting Tom's testimony, was inconclusive. Thus Matt Sacoll, who ran the pool hall and allegedly had known Petitioner for several months, testified that he did not recall seeing Petitioner at the pool hall on the night in question. Sacoll said that while putting away tools behind the counter, he heard gunshots. Looking up, he saw a woman and two men, one of whom had a gun; the three then fled the scene. Petitioner, he asserted, was not one of the three.

Similarly, one of Tom's two companions said Petitioner was the person who had said, "Shoot them." But the other, while stating that the person who had given the order to shoot was wearing a sling, could not identify Petitioner as the perpetrator. There was, however, medical evidence that Petitioner had been wounded in the arm several days before the shooting. But Donna Wan, the proprietor of a beauty shop, testified that Petitioner had been in her shop just before January 1 to have his hair washed. Although she noted stitches and a nasty wound to Petitioner's upper *123 arm, Petitioner was not then wearing a sling.

None of the other "maybe 30" people in the pool hall were called on by the state to confirm the "loud" order or that Petitioner had given it.

### Tom's cooperation agreement

The issue before us arises from testimony Tom gave at Petitioner's trial regarding Tom's arrest for grand larceny and the ensuing plea and sentencing agreement Tom made with the prosecution. About one month after Petitioner's arrest for the pool hall shooting, Tom was charged with attempted grand larceny in the second degree. In September 1991, several months before Petitioner's trial, Tom

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

pleaded guilty. In chambers, before Tom's judge, Tom's prosecutor gave his understanding of the condition of the plea Tom was making:

> Condition of the plea[,] the terms and conditions of the plea, as I understand them, Judge, is that the defendant will plead to the only remaining count in the indictment and be offered a promise of [Youthful Offender status] and probation. Further conditioned upon his continued cooperation with my office, which may include offering testimony, truthful testimony in a homicide case with which he's been cooperating ....

Toms's defense counsel and Tom himself then confirmed that this was the agreement. His counsel said, "My client has testified in the Grand Jury and is prepared to continue with whatever is needed, including, viewing line-ups, giving testimony, etc." These discussions were sealed by Tom's court, and Tom proceeded to enter his plea. In so doing, Tom specifically answered in the affirmative the judge's question as to whether Tom had attempted to steal money from a restaurant owner "by means of extortion, in that [Tom] attempted to steal that money by instilling in [the owner] a fear [that] if she did not turn over the money to [Tom], that [he would] cause her injury."

Subsequently, at Tom's sentencing, Tom's court indicated that Tom had pleaded guilty and "was *promised* five years probation and youthful offender treatment" (emphasis added). The assistant district attorney then said, "Your Honor, I ask you to honor the negotiated plea, and I also ask to reiterate the fact that this defendant [Tom], as part of his plea and as part of the promised sentence, was to give truthful testimony as he did in the Grand Jury and the trial that's ongoing in part J-10." After Tom's defense counsel waived the opportunity to speak, the court stated, "Consistent with the promise made, the sentence of the Court is five years probation."

Before the start of Petitioner's trial, Petitioner's prosecutor disclosed that Tom had pleaded guilty and was awaiting sentence. But while the prosecutor went on to say that Tom's judge "basically told the defendant that if he pled to the indictment, ... he would get probation," Petitioner's prosecutor also stated that while "there might have been some talk about [Youthful Offender treatment]," "[t]here was technically no agreement, as far as [the prosecutor knew.] [N]othing was put

or the record other than bench conferences that [Tom] continued to cooperate as a witness on this case and testify honestly during this trial if he were called as a witness."

On direct examination at Petitioner's trial, and on the same day as Tom's sentencing, the prosecutor elicited the following testimony from Tom:

> Q: Can you tell us whether or not you have been sentenced on that case?
> *124 A: Yes. I have. [FN2]

> > FN2. The federal district court considering the habeas petition now before us found Tom's testimony that he had been sentenced prior to testifying against Petitioner to be false. Our review of the record is inconclusive on this point. The sentencing definitely occurred on the same day that Tom appeared as a witness in this case. The state's contention that the sentencing occurred first is based on the facts that (1) Tom's prosecutor greeted Tom's sentencing court by saying, "Good morning, your Honor," whereas Tom's testimony against Petitioner in Petitioner's trial did not conclude until 12:40 p.m., and that (2) Tom accurately described in his testimony the sentence he actually received. Neither of these facts is determinative and there is evidence pointing the other way on the basis of which the district court made its finding. In fact, the state and Petitioner have not, despite all the years that this case has been under review, produced a definitive answer to this question. We need not, however, resolve the issue of the timing of Tom's sentence in relation to his testimony, and whether Tom lied about it, since we find other testimony by Tom to be clearly false and sufficient to compel us to grant the writ of habeas corpus.

> Q: Did the District Attorney's office make any promise to you with regard to what your sentence would be?
> A: No.
> Q: Would you please tell us what if anything the District Attorney's office, either myself or another Assistant District Attorney, promised you with regard to a sentencing on that case [sic]?

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

335 F.3d 119
(Cite as: 335 F.3d 119)

A: Nothing at all.

....

Q: We had contacted you and wanted you to continue to be a witness on this case?
A: Yes.

....

Q: Did the Judge that you stood in front of make any recommendation about what your sentence should be?

....

Q: The judge in the courtroom where you were sentenced what if anything did that Judge do with regard to your sentence?
A: He didn't promise me anything.
Q: Did he in fact sentence you?
A: Yes.
Q: And he sentenced you prior to your coming to Court to testify here?
A: Yes.
Q: What was the sentence of the Court?
A: He gave me five years probation.

....

Q: Did the Judge give you youthful offender treatment?
A: Yes.

On cross-examination, Petitioner's counsel did not make any further inquiry into Tom's plea agreement. Tom was asked, however, about the nature of his conviction and responded, "Well, maybe a month before [my arrest] I went in and I asked the owner for money." Petitioner's counsel then asked, "You just asked him politely for money, is that it?" Tom answered, "Yes." When questioned about whether he had made any threat, Tom replied that he had not. Asked, further, if this is what he told the judge when he pleaded guilty, Tom said that he told the judge that he and his friend had gone into the store and asked for money.

Out of the hearing of the jury, defense counsel argued to the judge and the prosecutor that Tom had lied about the circumstances of the attempted larceny. Counsel said to the prosecutor, "He's lying right there, you have a responsibility--he extorted money out of that guy." The prosecutor did not, however, make any attempt to correct Tom's manifestly false statement. Indeed, when defense counsel mentioned the implausibility of Tom's testimony *125 on this point in summation, the prosecutor, unsuccessfully, objected. And in her summation, despite her knowledge to the contrary, the prosecutor made a generalized effort to bolster

Tom's credibility. "[T]he other two witnesses [, one of whom was Tom,] were honest with you. [Defense counsel] would want you to believe ... first of all, that they were evasive. I submit they were not." "Ladies and gentlemen of the jury, I submit to you that what they told you was truthful, and honest."

*The Procedural History of this Case and its Effect on the Standard of Review*

On direct appeal in state court, Petitioner, in addition to claiming, *inter alia,* that the evidence against him was insufficient to support a conviction, asserted (a) that Tom had testified falsely when he stated that he had not received a promise of leniency from either the judge or the prosecution in exchange for his testimony against Petitioner and (b) that the prosecution's elicitation of that testimony was unconstitutional and prejudicial. The state argued both that this assertion was without merit and that it was not preserved for appellate review because Petitioner failed to provide an adequate record on appeal to support the claim and failed to object at trial.

The Appellate Division summarily affirmed the conviction. It rejected Petitioner's argument that the evidence was insufficient to support the guilty verdict and stated that "[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit." *People v. Shih-Wei Su,* 213 A.D.2d 502, 624 N.Y.S.2d 904, 904 (1995). Since the prosecutorial misconduct allegation was among Petitioner's "remaining contentions," it is not clear from the face of the order whether the Appellate Division adjudicated this allegation on the merits, or decided it on procedural grounds. *See Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 810-11 (2d Cir.2000) ("[W]hen a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' ... [t]he state court has not adequately indicated that its judgment rests on a state procedural bar, and its reliance on local law is not clear from the face of the court's opinion." (citation omitted)).

Over the ensuing years, Petitioner, in various ways, sought to raise in state courts the issue that he has now brought before us. We need not, however, examine these claims in detail. Some of them seem to have been designed to show cause for possible

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

335 F.3d 119
**(Cite as: 335 F.3d 119)**

Page 6

procedural defects, e.g., by attacking the effectiveness of counsel. Others involved allegations that went directly to the merits, e.g., alleging newly discovered evidence. The answers given by the state courts, moreover, do not make clear whether the denials of these claims were on procedural grounds or were merits-based.

[1] What might, however, be a mare's nest is readily avoided. The state has waived the argument that Petitioner's claims are procedurally barred, thereby obviating the need for us to examine whether there was federally valid cause and prejudice, *see, e.g., Jones v. Keane,* 329 F.3d 290, 296 (2d Cir.2003), for such a default. Instead, the state asserts that the decisions made by the state courts constituted an adjudication on the merits of Petitioner's claims, and as such require us to give those decisions deference under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 ("AEDPA"), as interpreted by this court in *Sellan v. Kuhlman,* 261 F.3d 303 (2d Cir.2001). In fact, the degree of deference due state holdings in circumstances such as those before us is, under our cases, *126 anything but clear. [FN3] Nevertheless, since (a) the state manifestly can waive procedural objections, *see, e.g., Cossel v. Miller,* 229 F.3d 649, 653 (7th Cir.2000), and (b) treating the state decisions as merit adjudications and giving them full AEDPA deference, we conclude that a grant of habeas is required, we need not--and hence do not--resolve the complex questions that might arise from this case's long and tortured procedural background.

FN3. In *Ryan v. Miller,* 303 F.3d 231, 246 (2d Cir.2002), we granted AEDPA deference to a state court that had used the language that a particular claim was "either unpreserved for appellate review or without merit." But we did this, and treated the state decision as on the merits, because the record showed that the petitioner had preserved the disputed claim at every stage, thereby indicating that the Appellate Division had not denied that claim because it was unpreserved. *Id.* at 246 n. 6. Conversely, we have also held that where a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and

where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits. *Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir.2003). And we did so fully aware that we have also "explicitly h[e]ld that when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama,* 235 F.3d at 810.

In other words, our cases seem to contemplate situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required. But, to decide the instant case, we need not determine whether that indeed is so.

Accordingly, we now turn to why we believe that the state court's adjudication of the Due Process claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," the standard of review required under the AEDPA. 28 U.S.C. § 2254(d)(1).

*The State's Knowing Elicitation of Perjury*

[2] Since at least 1935, it has been the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution. *See Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). This is so because, in order to reduce the danger of false convictions, we rely on the prosecutor not to be simply a party in litigation whose sole object is the conviction of the defendant before him. The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost. *See, e.g., Jenkins v. Artuz,* 294 F.3d 284, 296 n. 2 (2d Cir.2002) (noting the duty of prosecutors under New York law "to seek justice, not merely to convict").

[3][4][5] Despite the fundamental nature of the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

335 F.3d 119
(Cite as: 335 F.3d 119)

injury to the justice system caused by the knowing use of perjured testimony by the state, the Supreme Court has not deemed such errors to be "structural" in the sense that they "affect[ ] the framework within which the trial proceeds." *United States v. Feliciano,* 223 F.3d 102, 111 (2d Cir.2000) (quoting *Arizona v. Fulminante,* 499 U.S. 279, 307-10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (brackets in original)). Structural errors are those that " 'so fundamentally undermine the fairness or the validity of the trial that they require voiding [the] result [of the trial] regardless of identifiable prejudice.' " *Id.* (quoting *Yarborough v. Keane,* 101 F.3d 894, 897 (2d Cir.1996)). Instead, even when a prosecutor elicits testimony he or she knows or should know to be false, or allows such *127 testimony to go uncorrected, a showing of prejudice is required. But the Supreme Court has made clear that prejudice is readily shown in such cases, and the conviction must be set aside unless there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *see also United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991) (citing *Agurs* and adding that the Supreme Court cases mean that "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic" (quotation marks omitted)). This then is the "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), that we must apply in the case before us. And to do this we must ask: (1) whether false testimony was introduced, (2) whether that testimony either was or should have been known to the prosecution to be false, (3) whether the testimony went uncorrected, and (4) whether the false testimony was prejudicial in the sense defined by the Supreme Court in *Agurs.*

*Whether there was testimony known to the prosecutor to be false*

[6][7] As the district court found, the first three prongs of the inquiry are easily met. Tom's statement made in open court that he was not promised anything by the sentencing judge or by the prosecution in exchange for his testimony is, in light of the transcript of Tom's allocution and sentencing, obviously false. It is also clear that Tom lied about the nature of the attempted larceny charge. The

prosecution not only allowed both of these misrepresentations to go uncorrected, but it bolstered Tom's credibility in summation, even going so far as to object when Petitioner's defense counsel expressed incredulity that Tom's larceny arrest came after he "politely" asked the restaurant proprietor for money.

The prosecutor in Petitioner's case was apparently not the one who had made the plea deal with Tom. But the Supreme Court has held that that doesn't matter. *See Giglio,* 405 U.S. at 154, 92 S.Ct. 763. "The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Id.* It follows that, before a prosecutor puts to the jury evidence that a witness has made no deal with the government, he or she has a fundamental obligation to determine whether that is so. That obligation was not met here.

*Whether there was sufficient prejudice*

Having agreed with the district court that the prosecution failed in its duty to avoid eliciting false testimony, we are left to decide whether this breach injured the defendant in the relevant way. "A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Giglio,* 405 U.S. at 154, 92 S.Ct. 763 (quotation marks and alterations omitted).

A.

As far as the Supreme Court cases are concerned, this is all that is required. But in *United States v. Helmsley,* 985 F.2d 1202, 1208 (2d Cir.1993), we held that, at least for purposes of a collateral attack, a defendant is normally required to exercise due diligence in gathering and using information to rebut a lying prosecution witness. Having so held in *Helmsley,* we could hardly deem unreasonable a state court decision made on a similar ground. And so we must examine whether it would *128 be unreasonable to hold that Petitioner failed, in the instant case, to exercise due diligence. [FN4]

> FN4. That said, we should note that *Helmsley* itself is quite limited in its scope. For, as we said in *Helmsley,* an exception to the diligence requirement exists when the prosecutor was "directly involved as a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

participant in the transaction about which the witness has allegedly lied." *Id.* at 1207.

Such direct participation by the prosecutor both makes clear the prosecutor's knowledge of the falsity of the statement and leads to a situation in which contradiction of the witness's testimony "runs the risk of implicating the credibility of the prosecutor before the jury." *Helmsley* itself, instead, dealt only with a situation in which the defendant had in her hands the documents that could have been used to discredit the prosecution witness and in which the witness's lie did not concern conduct in which the government had played a part. In this respect, our decision in *Jenkins,* which was decided after *Helmsley* and applied AEDPA deference, deserves mention. In *Jenkins,* the prosecution revealed before trial that it had made a plea agreement with one of its witnesses. 294 F.3d at 287. But, on cross-examination, the witness steadfastly denied that any such deal was made. On redirect, the prosecutor asked the witness whether the witness had made any deals with *her.* The witness replied he had not, which was technically true, because the deal had been reached with another assistant district attorney. *Id.* at 288-89. Not surprisingly, the *Jenkins* court decided that the prosecution's conduct, in light of its pretrial admission, could not have been anticipated by defense counsel, who had done the best he could under the circumstances.

Petitioner's only possible lack of diligence was his failure to cross-examine Tom about the existence of a sentencing deal. Significantly, the state does not argue that Petitioner knew the details of the sealed agreement or that Petitioner even knew for sure that there was a deal. Rather, it contends only that Petitioner had some information that a deal *might* have been made. But, Petitioner's prosecutor expressly (a) falsely denied before trial that an actual agreement had been reached with Tom and (b) falsely established on direct examination that no promises with respect to Tom's sentence had been made to Tom either by the state or by the sentencing judge.

[8] In other words, in order to do what the state suggests Petitioner should have done, Petitioner would have been required to assume that the prosecutor had lied. This would involve enormous tactical danger. And it seems hardly reasonable to require a defendant to risk opening the door to adverse testimony concerning a sentencing agreement from a government witness on the chance that the prosecutor had both intentionally mischaracterized that witness's dealings with the government before trial and knowingly elicited false testimony denying that an agreement had been made. But even apart from that, the Supreme Court, in an analogous situation, has made clear that conscientious counsel *can* rely on prosecutors to live up to their obligations. *See Strickler v. Greene,* 527 U.S. 263, 286-87, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ("The presumption, well established by tradition and experience, that prosecutors have fully discharged their official duties is inconsistent with the novel suggestion that conscientious defense counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." (internal citation and quotation marks omitted)). It follows that when a prosecutor says that there was no deal and later elicits testimony from a witness denying the existence of a deal, it would be an unreasonable application of federal law, as determined by the Supreme Court, to fault the defendant for not proceeding in his cross-examination on the assumption that the prosecutor is a liar.

*129 B.

We, therefore, move to apply directly the test given to us by the Supreme Court, which has told us that convictions in cases of this sort must be reversed unless the evidence was so overwhelming that there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103, 96 S.Ct. 2392.

[9] It is not disputed that Petitioner's conviction depended significantly on Tom's testimony. Indeed the district court described him as "[t]he prosecution's chief witness against petitioner." *Shih Wei Su v. Filion,* No. 01-CV-3799, slip op. at 2 (E.D.N.Y. Oct. 7, 2002). While a likely associate of Tom's also identified Petitioner as the one who gave the order to shoot, another did not, and there was other acceptable testimony running in favor of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Petitioner.

The case was not overwhelming either way. On the one hand, the evidence was surely sufficient to uphold the jury conviction, and would have been so without Tom's testimony. On the other, the jury could also have perfectly reasonably acquitted Petitioner even without being told about the plea agreement. The additional evidence that Tom had a deal with prosecutors and with his sentencing judge was certainly material to assessing Tom's credibility, and that credibility could not help but be central to the deliberations of any reasonable jury sorting through the facts of the case. And, as the Supreme Court said in *Napue:* "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue,* 360 U.S. at 269, 79 S.Ct. 1173. Here Tom's possible interest in testifying falsely was anything but subtle. And that interest, as the district court found, was kept from the jury, in substantial part by the prosecutor's own behavior. [FN5] There was, in other words, as we found in *Jenkins,* a "heightened opportunity for prejudice[, since] the prosecutor ... [was] complicit in the untruthful testimony." 294 F.3d at 295.

FN5. Since Tom's lies about his plea deal suffice to show prejudice, we have not discussed Tom's other misstatements of which the prosecution was aware. A few words about one of these, Tom's erroneous testimony regarding the nature of his conviction for attempted grand larceny, is in order, however. This testimony was the subject of Petitioner's attack on Tom's credibility at summation and was also questioned during trial. But it is still quite troublesome that the jury was presented only with Petitioner's invitation to doubt the general plausibility of a grand larceny conviction for asking "politely" for money. The prosecution knew the facts were otherwise, and it should have corrected the misimpression left by its principal witness rather than stating broadly that Tom had testified truthfully. The jurors may well have assumed that the prosecutor knew the nature of Tom's conviction. If so, why would the prosecutor say that Tom was truthful if the circumstances of the conviction were not at all as Tom had described them? It is, therefore, hard to be confident that a correction by the prosecutor on this point would not have affected the jury's evaluation of Tom as a witness.

In *Jenkins,* despite our grant of AEDPA deference, the conviction was reversed. 294 F.3d at 291, 297. Likewise here, we conclude that it would be an unreasonable application of the standard for prejudice clearly set out by the Supreme Court, in cases like *Napue, Giglio,* and *Agurs,* to find insufficient prejudice in this case. [FN6]

FN6. Because more reasons for the result we reach are not needed, we have not included in our discussion any account of the possible effect on a jury of the fact, in itself, that Tom lied under oath. This fact would likely negatively impact Tom's credibility as much or more as the revelations of the true nature of his grand larceny conviction or of his plea agreement with the prosecution. Significantly, we have previously held that the very fact of the witness's untruthfulness is itself relevant to an analysis of prejudice. *Wallach,* 935 F.2d at 458 (citing and quoting *United States v. Stofsky,* 527 F.2d 237 (2d Cir.1975)). Similarly, we need not decide whether an analysis of prejudice should include how devastating to the state's case it might have been had the jury learned that the prosecutor knowingly (or recklessly) elicited the false testimony.

*130 *Conclusion*

There being no question that false testimony was introduced to bolster the credibility of the principal prosecution witness and there being no reasonable application of federal law under which it could be said that the prejudice suffered by Petitioner fell short of the legal standard established by the Supreme Court of the United States, we REVERSE the district court's denial of Petitioner's request for a writ of habeas corpus, and we REMAND the case

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

335 F.3d 119
**(Cite as: 335 F.3d 119)**

to that court with instructions to grant the writ and
to order Petitioner released unless the state affords
him a new trial within sixty days.

335 F.3d 119

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**EXHIBIT B:  REPORTED MISCONDUCT CASES INVOLVING QUEENS COUNTY PROSECUTORS**

**I.  PUBLISHED COURT DECISIONS (1985 – 2004) REVERSING CONVICTIONS BECAUSE QUEENS COUNTY PROSECUTORS WRONGFULLY WITHHELD EVIDENCE FROM THE DEFENSE**

1.      People v. Manzione, 109 A.D.2d 755 (2d Dept. 1985) (reversing robbery conviction where the prosecutor failed to disclose the initial description of the perpetrators given by the complainant).

2.      People v. Robinson, 133 A.D. 859 (2d Dept. 1987) (reversing convictions for murder and robbery where the prosecutor withheld a witness statement directly implicating persons other than the two defendants as the perpetrators and the materially inconsistent statement of a key prosecution witness).

3.      People v. Nelu, 157 A.D.2d 864 (2d Dept. 1990) (reversing burglary conviction where the prosecutor failed to disclose several prior statements of the People's witnesses).

4.      People v. Munoz, 161 A.D.2d 807 (2d Dept. 1990) (reversing criminal trespass conviction where the prosecutor failed to disclose prior statements of the People's principal witness).

5.      People v. Rivera, 170 A.D.2d 544 (2d Dept. 1991) (reversing a rape conviction because the prosecutor failed to disclose police reports that were "in direct conflict" with the complainant's rape allegation).

6.      People v. Gaskins, 171 A.D.2d 272 (2d Dept. 1991) (reversing sodomy conviction where the prosecutor failed to disclose the videotape of an interview of the alleged child victim).

7.      People v. Delace, 174 A.D.2d 688 (2d Dept. 1991) (reversing robbery conviction where the prosecutor failed to disclose witness statements).

8.      People v. Baba-Ali, 179 A.D.2d 725 (2d Dept. 1992) (reversing a rape conviction involving a four-year-old child where, despite a court order, the prosecutor failed until

the eve of trial to disclose medical records finding no signs of sexual abuse).

9.      People v. Campbell, 180 A.D.2d 824 (2d Dept. 1992) (reversing a robbery conviction because the prosecutor withheld hospital records which contained statements of the complainant contradicting her trial testimony).

10.     People v. Clausell, 182 A.D.2d 132 (2d Dept. 1992) (reversing a narcotics conviction where the prosecutor repeatedly denied the existence of a "buy report," which turned out to include a description of the buyer wholly at odds with the description the arresting officer had said he received and matched to the defendant).

11.     People v. Banch, 80 N.Y.2d 610 (1992) (reversing manslaughter conviction where the prosecutor "mistakenly" gave the defense the wrong police memo book, withheld prior affidavits of a People's witness, and falsely represented that a report by another People's witness contained no information required to be disclosed).

12.     People v. Davis, 196 A.D.2d 597 (2d Dept. 1993) (reversing a rape and robbery conviction where the prosecutor had refused to disclose the basis for the People's expert's conclusion that defendant's DNA matched that found on the victim).

13.     People v. Steadman/Blair, 82 N.Y.2d 1 (N.Y. 1993) (reversing a defendant's manslaughter conviction where the District Attorney's Office made a "determined effort" to avoid its obligations to disclose exculpatory evidence and to correct false testimony, by employing a "scheme" under which a supervisor in the Office would make a cooperation agreement with a witness's attorney, but not reveal the agreement to the prosecutors handling the defendant's case at trial, and not correct the witness's false testimony denying such an agreement); People v. Blair, 186 A.D.2d 665 (2d Dept.1992) (noting that the scheme operated on "the executive level of the District Attorney's Office").

14.     People v. Gaines, 199 A.D.2d 335 (2d Dept. 1993) (reversing manslaughter conviction where the District Attorney's Office employed the same scheme condemned in Steadman, i.e., withholding a cooperation agreement made between the trial assistants' superior and the principal prosecution witness's attorney).

15.     People v. Fearnot, 200 A.D.2d 583 (2d Dept. 1994) (reversing robbery conviction, where the prosecutor withheld prior statements of the complainant describing the robbery, suggested, without evidentiary support, that the defendant was a prostitute, and tried to inflame the jury by citing the AIDS epidemic).

16.     People v. Kirchner, 200 A.D.2d 766 (2d Dept. 1994) (reversing assault conviction where the prosecution failed to disclose witness statements).

17.    People v. Baxley, 84 N.Y.2d 208 (1994) (remitting a CPL 440 motion challenging a murder conviction for a hearing to determine the truth and materiality of a witness's affidavit that prior to trial he informed the prosecutor that he and a People's witness had been induced by police to fabricate a jail-house confession, which the Court of Appeals deemed "crucial" to the People's case) (*Mr. Baxley was killed in prison before the hearing could be held, according to his counsel, Harold Ferguson).

18.    People v. Moustakis, 226 A.D.2d 401 (2d Dept. 1996) (reversing conviction where the prosecutor presented a cooperating witness who "forgot" the details of his past crimes, but withheld 16 pages of interview notes detailing these crimes for the District Attorney's Office).

19.    People v. May, 228 A.D.2d 523 (2d Dept. 1996) (reversing a murder conviction where the prosecutor failed to disclose a cooperation agreement with its star witness, and failed to correct his false testimony that no such agreement existed).

20.    People v. Croons, 231 A.D.2d 585 (2d Dept. 1996) (reversing robbery conviction where the prosecution wrongfully withheld prior statements of a key witness, the complainant).

21.    People v. Huynh, 232 A.D.2d 655 (2d Dept. 1996) (reversing robbery conviction where the defense was misidentification, and the prosecutor failed to preserve a 911 tape containing the complainant's initial description of the robber).

22.    People v. Ying, 236 A.D.2d 630 (2d Dept. 1997) (reversing robbery conviction on other grounds, while condemning the prosecutor's withholding of the terms of a cooperation agreement with a People's witness).

23.    People v. Gallman, 240 A.D.2d 512 (2d Dept. 1997) (granting CPL 440 motion where the prosecutor wrongfully withheld a police interview of the People's main witness)

24.    People v. Burch, 247 A.D.2d 546 (2d Dept. 1998) (reversing robbery conviction where the defense was misidentification, and the prosecutor failed to preserve a 911 tape containing the initial description of the robber).

25.    People v. Mackey, 249 A.D.2d 329 (2d Dept. 1998) (reversing robbery conviction where the prosecutor "deliberately" set a trap for the defense at trial by withholding critical information required to be disclosed earlier).

26.    Jenkins v. Artuz, 294 F.3d 284 (April 1, 2002) (after a prosecutor caused a

mistrial by withholding a crucial witness's cooperation agreement until the day of his testimony, the defendant's murder conviction at a second trial was overturned on federal habeas corpus review because the prosecutor allowed the witness to falsely deny the existence of the agreement, objected to the defense's efforts to bring it out, reinforced the witness's false denial on redirect, and bolstered the false testimony in summation).

27.    Su v. Filion, 335 F.3d 119 (July 11, 2003) (granting habeas corpus relief in a murder case where the prosecutor failed to disclose a crucial witness's cooperation agreement, knowingly presented the witness's perjured testimony denying the existence of such an agreement and lying about his criminal conduct, and improperly bolstered the witness's false testimony on summation).

28.    Turner v. Schriver, 327 F.Supp.2d 174 (July 21, 2004) (granting federal habeas corpus relief in a robbery case where the prosecutor failed to disclose the criminal record of the People's only witness to the crime and falsely represented to the jury that the witness had no record).

## II.   PUBLISHED COURT DECISIONS (1985 – 2004) REVERSING CONVICTIONS BECAUSE QUEENS COUNTY PROSECUTORS KNOWINGLY PRESENTED FALSE OR MISLEADING EVIDENCE OR ARGUMENT

1.   <u>People v. La Rosa</u>, 112 A.D.2d 954 (2d Dept. 1985) (reversing robbery conviction where the prosecutor misrepresented material facts, misquoted testimony and committed other improprieties in summation).

2.   <u>People v. Hines</u>, 112 A.D.2d 316 (2d Dept. 1985) (reversing robbery conviction where the prosecutor improperly suggested that there was "other evidence against defendant, of which [the jury] had not been told").

3.   <u>People v. Williams</u>, 112 A.D.2d 177 (2d Dept. 1985) (reversing robbery conviction where, among other things, the prosecutor misled the jury by implying that the defendant's mistaken-identity defense required the jury to find the complainant had lied, and improperly vouched for his case by citing his own and his Office's "integrity").

4.   <u>People v. Torres</u>, 111 A.D.2d 885 (2d Dept. 1985) (reversing burglary conviction where the prosecutor "improperly suggested that the jury would be subject to scorn and ridicule if they acquitted defendant," and committed other improprieties).

5.   <u>People v. Hooks</u>, 110 A.D.2d 909 (2d Dept. 1985) (reversing rape and burglary conviction where the prosecutor violated the fundamental rule that a defendant should be tried only for the crime charged by suggesting defendant's prior crimes were proof that he had committed the instant crimes).

6.   <u>People v. Jones</u>, 108 A.D.2d 824 (2d Dept. 1985) (reversing robbery conviction where, among other things, the prosecutor improperly elicited that the defendant had previously hit a woman with a bat and then suggested that the jury could never believe a man who had done this).

7.   <u>People v. Pascullo</u>, 120 A.D.2d 687 (2d Cir. 1986) (reversing assault conviction where the prosecutor suggested improper inferences of racial motivation and informed the jury that an acquittal would be a condonation of racism).

8.   <u>People v. Beaman</u>, 122 A.D.2d 848 (2d Dept. 1986) (reversing murder conviction where the prosecutor called a witness the prosecutor knew would refuse to testify, for the purpose of having the jury draw unwarranted inferences from the questions posed and speculate that the witness had been threatened).

9.    People v. Ciervo, 123 A.D.2d 393 (2d Dept. 1986) (reversing manslaughter conviction where the prosecutor made numerous improper references "implying that a conviction was warranted based solely upon the defendant's character").

10.    People v. Robinson, 123 A.D.2d 796 (2d Dept. 1986) (reversing criminal possession of stolen property conviction where the prosecutor explained a police failure to take fingerprints by saying it would serve no purpose "when we know who did it").

11.    People v. Anderson, 123 A.D.2d 770 (2d Dept. 1986) (reversing murder conviction where the prosecutor recalled a witness whom the prosecutor knew would refuse to testify, for the purpose of having the jury draw unwarranted inferences against the defendant).

12.    People v. Brown, 125 A.D.2d 321 (2d Dept. 1986) (reversing rape conviction where the prosecutor falsely implied that the defendant's stipulation that the victim had been raped was a stipulation that all of her testimony was truthful, and told the jurors that if they did not believe the victim there was something "terribly wrong with [them]").

13.    People v. Montalvo, 125 A.D.2d 338 (2d Dept. 1986) (reversing robbery conviction where the prosecution drew the jury's attention to the defendant's failure to testify or call witnesses, a constitutionally impermissible consideration).

14.    People v. Faison, 126 A.D.2d 739 (2d Dept. 1987) (reversing robbery conviction where the prosecutor improperly commented on the defendant's assertion of his constitutional right to remain silent and misleadingly suggested that the defendant had the burden of proving his alibi defense).

15.    People v. Perez, 127 A.D.2d 707 (2d Dept. 1987) (reversing burglary conviction where the prosecutor made a "deliberate attempt to mislead the jury to infer that the defendant had two, rather than one, prior [youthful offender] adjudications").

16.    People v. Copeland, 127 A.D.2d 846 (2d Dept. 1987) (holding that mistrial was appropriately granted where the prosecutor intentionally and repeatedly disobeyed court orders not to impeach the defendant with his post-arrest silence, a constitutionally impermissible consideration).

17.    People v. Simms, 130 A.D.2d 525 (2d Dept. 1987) (reversing assault conviction for "pervasive" prosecutorial misconduct, including repeated allusions to "facts" not in evidence).

18.    People v. Scoon, 130 A.D.2d 597 (2d Dept. 1987) (reversing assault conviction where the prosecutor asked the jury to infer that matters not in evidence corroborated the

complainant's testimony and to infer that defendants were selling drugs, of which there was no evidence).

19.   <u>People v. Torriente</u>, 131 A.D.2d 793 (2d Dept. 1987) (reversing criminal possession of a weapon conviction where the prosecutor asked "misleading and prejudicial" questions about a defense witness's drug use and improperly implied that the defendant was an illegal alien or had been deported from Cuba).

20.   <u>People v. Romain</u>, 137 A.D.2d 848 (2d Dept. 1988) (reversing drug conviction where the prosecutor's "mischaracterization of the defendant's testimony, which was intended to convince the jury that the defendant had admitted his guilt when he had not, constitute[d] a gross distortion, the magnitude of which was highly prejudicial").

21.   <u>People v. Dunlap</u>, 138 A.D.2d 393 (2d Dept. 1988) (reversing conviction where the prosecutor "diverted the jury's attention" from inconsistencies in the People's evidence by telling a lengthy story comparing the defendants to sharks smelling blood and attacking the prey).

22.   <u>People v. Chin</u>, 138 A.D.2d 389 (2d Dept. 1988) (reversing rape conviction where the prosecutor sought to divert the jury from the issue of whether the defendant had raped the victim by conveying through "insinuation, suggestion and speculation" that the defendant and his character witness were in the habit of molesting little girls).

23.   <u>People v. Stewart</u>, 153 A.D.2d 706 (2d Dept. 1989) (reversing robbery conviction where "the trial was marked by the prosecutor's efforts, even over sustained objections, to characterize the defendant as an individual predisposed to commit the crime charged").

24.   <u>People v. Langford</u>, 153 A.D.2d 908 (2d Dept. 1989) (reversing robbery conviction where the prosecutor repeatedly argued that to acquit the defendant the jury would have to find that the complainant lied, which tended "to divert the jury's attention away from the central issue of identification and to shift the burden of proof thereon to the defendant")

25.   <u>People v. Durham</u>, 154 A.D.2d 615 (2d Dept. 1989) (reversing conviction for operation of a motor vehicle while intoxicated, where the prosecution vouched for the People's witnesses and repeatedly, unjustifiably called the defendant a "loud drunk" and claimed his testimony was fabricated).

26.   <u>People v. Gomez</u>, 156 A.D.2d 462 (2d Dept. 1989) (reversing murder conviction because of the "frequency" and "outrageousness" of the prosecutor's misconduct, including attempts to mislead the jury regarding the defendant's pretrial contact with a

defense witness, inflame the jury, and shift the burden of proof).

27.   People v. Pinkas, 156 A.D.2d 485 (2d Dept. 1989) (reversing attempted rape conviction where, despite repeated admonitions by the trial court, the prosecutor persisted in "seeking to convince the jury to convict based upon a claimed propensity of the defendant").

28.   People v. Gunther, 175 A.D.2d 262 (2d Dept. 1991) (reversing drug sale conviction where the prosecutor engaged in "a deliberated and calculated strategy to convict on the basis of improper and prejudicial hyperbole" and inferences that the defendant had a criminal propensity).

29.   People v. Stevens, 174 A.D.2d 640 (2d Dept. 1991) (reversing rape conviction where the prosecutor tried to mislead the jury by insinuating that the defendant had committed sodomy on the victim, which was not in issue at the trial).

30.   People v. Parker, 178 A.D.2d 665 (2d Dept. 1991) (reversing drug conviction where the prosecutor attempted "to mislead the jury into finding the defendant Parker guilty by association" and invited the jury to draw inferences from the demeanor of the defendant's 14-year-old daughter as she sat in the audience).

31.   People v. Figueroa, 181 A.D.2d 690 (2d Dept. 1992) (reversing drug conviction where the prosecutor elicited testimony from the defendant's alibi witness that "could have no other purpose than to show a propensity to commit the crime charged" and made it appear that the witness was attempting to withhold the information from the jury).

32.   People v. Andre, 185 A.D.2d 276 (2d Dept. 1992) (reversing murder conviction where, among other things, the prosecutor improperly appealed to the sympathy of the jury).

33.   People v. Nieves, 186 A.D.2d 276 (2d Dept. 1992) (reversing assault conviction where the prosecutor, without supporting evidence, portrayed the defendant as suffering from a psychiatric illness that might cause her to act violently).

34.   People v. Odle, 187 A.D.2d 536 (2d Dept. 1992) (reversing drug conviction where the prosecutor "attempted to have the defendant found guilty by association" and based on "criminal propensity and bad character").

35.   People v. Robinson, 191 A.D.2d 595 (2d Dept. 1993) (reversing assault conviction where the prosecutor argued that the defendant had a violent criminal disposition, and elicited misleading medical testimony).

36.    People v. Hill, 193 A.D.2d 619 (2d Dept. 1993) (reversing robbery conviction where "the prosecutor's extensive cross examination questions and summation comments about the defendant's drug selling were clearly intended to show the defendant's criminal propensity").

37.    People v. Torres, 199 A.D.2d 442 (2d Dept. 1993) (reversing drug conviction where the prosecutor improperly suggested that a defense witness wanted to help the defendant because the defendant was his drug supplier and tried to inflame the jury by emphasizing the problem of drugs in schools).

38.    People v. Elder, 207 A.D.2d 498 (2d Dept. 1994) (reversing attempted murder conviction where the prosecutor engaged in "flagrant" misconduct, including urging the jury to make findings that were not supported by the evidence).

39.    People v. Montesa, 211 A.D.2d 648 (2d Dept. 1995) (reversing assault conviction where the prosecutor made argument that was not supported by the evidence and made other improper remarks in summation).

40.    People v. Moss, 215 A.D.2d 594 (2d Dept. 1995) (reversing robbery conviction where the prosecutor made numerous referenced to the defendant as a "violent person" and compared him to the murderous film character Hannibal Lecter from "Silence of the Lambs").

41.    People v. Leuthner, 216 A.D.2d 327 (2d Dept. 1995) (reversing robbery conviction for several instances of prosecutorial misconduct, including violating the fundamental rule that the prosecutor may not force the defendant to comment on whether the complainant was lying and, with no good-faith basis, asking about alleged threats by the defendant's father).

42.    People v. Scott, 217 A.D.2d 564 (2d Dept. 1995) (reversing robbery conviction for "flagrant" and "pervasive" prosecutorial misconduct, including urging the jury to convict the defendant on the basis of his alleged criminal propensity).

43.    People v. James, 218 A.D.2d 709 (2d Dept. 1995) (in reversing robbery conviction, court criticized the prosecutor's "unacceptable practices" of suggesting that the complainant was either correct in his identification or lying and that the defendant's criminal record indicated a criminal propensity).

44.    People v. Torres, 223 A.D.2d 741 (2d Dept. 1996) (reversing robbery conviction where the prosecutor's comments on summation misled the jury by falsely suggesting the defendant had an obligation to testify and present evidence, which improperly shifted the burden of proof).

45.    People v. Bonnen, 236 A.D.2d 479 (2d Dept. 1997) (reversing weapon possession conviction where the sole eyewitness could not identify the defendant, but the prosecutor implied that identification was not in issue because the police had arrested the defendant after they conducted an "in depth" investigation, and the prosecutor told the jury he would present testimony, although he had none, that another victim was shot by the defendant).

46.    People v. Walters, 251 A.D.2d 433 (2d Dept. 1998) (reversing attempted murder conviction where the prosecutor purposefully persisted in making inflammatory remarks designed to appeal to the jury's sympathy, shifted the burden of proof, gave his own opinion on the truth and falsity of the evidence, and, most egregiously, "advocat[ed] a position which he knew to be false," namely that the gun found on the defendant was the gun used in the crime).

47.    People v. Brown, 256 A.D.2d 414 (2d Dept. 1998) (reversing robbery conviction where the prosecutor commented on the defendant's failure to testify, thus violating the fundamental rule that a defendant may not be penalized for exercising his constitutional right to remain silent, misstated the evidence, and made references to matters not in evidence).

48.    People v. Anderson, 256 A.D.2d 413 (2d Dept. 1998) (reversing attempted murder conviction where the prosecutor "misled the jury by pointing to the absence of [exculpatory] evidence that he knew existed").

49.    People v. Robinson, 260 A.D.2d 508 (2d Dept. 1999) (reversing robbery conviction where the prosecutor equated acquittal with a finding that the complainant lied, attempted to appeal to fear and sympathy, and gave his own opinion that the defense witness was lying).

50.    People v. Alfaro, 260 A.D.2d 495 (2d Dept. 1999) (in reversing a robbery conviction for insufficient the evidence, the court condemned the prosecutor's statement that the defendant had no presumption of innocence, request that the jury infer guilt from the fact that the defendant had a lawyer at the time he surrendered, and implication that guilt could be inferred from the defendant's mere presence at the crime scene).

51.    People v. Lewis, 262 A.D.2d 584 (2d Dept. 1999) (reversing drug conviction where, among other things, the prosecutor improperly asked a witness whether defense counsel had offered him money or drugs for his testimony).

52.    People v. Washington, 278 A.D.2d 517 (2d Dept. 2000) (reversing rape conviction on other grounds and condemning the prosecutor's argument that the defendant's testimony was fabricated after having had "the benefit of counsel," to which

he had a constitutional right, and warning the jury not to be "fooled").

53.   People v. Smith, 288 A.D.2d 496 (2d Dept. 2001) (reversing robbery conviction where the prosecutor offered her personal view that defendant was guilty, improperly appealed to the jury's sympathy, improperly shifted the burden of proof, and improperly implied without such evidence that a witness who did not testify would have corroborated the victim's account).

54.   Jenkins v. Artuz, 294 F.3d 284 (April 1, 2002) (after a prosecutor caused a mistrial by withholding a crucial witness's cooperation agreement until the day of his testimony, the defendant's murder conviction at a second trial was overturned because the prosecutor allowed the witness to falsely deny the existence of the agreement, objected to the defense's efforts to bring it out, reinforced the witness's false denial on redirect, and bolstered the false testimony in summation).

55.   People v. Ni, 293 A.D.2d 552 (2d Dept. 2002) (reversing assault conviction where the prosecutor's "flagrant", improper comments shifted the burden of proof, inflamed the jury, and denigrated the defense).

56.   People v. Lauderdale, 295 A.D.2d 539 (2d Dept. 2002) (reversing manslaughter conviction where the prosecutor made 31 references to the defendant's "highly prejudicial" nickname, "Homicide").

57.   People v. Jones, 305 A.D.2d 698 (2d Dept. 2003) (reversing robbery conviction where the prosecutor deliberately attempted to create the unfair impression that the codefendant had implicated the defendant to police).

58.   Su v. Filion, 335 F.3d 119 (July 11, 2003) (granting habeas corpus relief in a murder case where the prosecutor failed to disclose a crucial witness's cooperation agreement, knowingly presented the witness's perjured testimony denying the existence of such an agreement and lying about his criminal conduct, and improperly bolstered this false testimony on summation)  (*also listed above as an evidence suppression case).

59.   Turner v. Schriver, 327 F.Supp.2d 174 (July 21, 2004) (granting habeas corpus in a robbery case where the prosecutor failed to disclose the criminal record of its only witness to the crime and falsely represented to the jury that the witness had no record). (*also listed above as an evidence suppression case).